IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DATA RESEARCH AND HANDLING, INC. d/b/a WORKFORCE RELO, )<br>)<br>Plaintiff, )<br>v. )<br>UPSTATE ALLIANCE OF REALTORS, INC., )<br>UPSTATE ALLIANCE OF REALTORS )<br>MULTIPLE LISTING SERVICE, INC., PONE )<br>VONGPHACHANH, INDIANA ASSOCIATION )<br>OF REALTORS, INC., and NATIONAL )<br>ASSOCIATION OF REALTORS, INC., )<br>)<br>Defendants. | Case No. 1:16-cv-00392 -JVB-SLC |

### PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES

**COMES NOW** the Plaintiff, Data Research and Handling, Inc. d/b/a Workforce Relo ("Workforce") by counsel, and for their complaint against the Defendants herein, state as follows:

### THE PARTIES

1. Plaintiff is an Indiana Corporation, doing business and headquartered in Fort Wayne, Allen County, Indiana.

2. Defendant Upstate Alliance of Realtors, Inc. ("Upstar"), is an Indiana not for profit corporation, doing business in Fort Wayne, Allen County, Indiana, and headquartered at 3404 East Dupont Road, Fort Wayne, Indiana.

3. Defendant Upstate Alliance of Realtors Multiple Listing Service, Inc. ("Upstar MLS"), is an Indiana for profit corporation, doing business in Fort Wayne, Allen County, Indiana, and headquartered at 3404 East Dupont Road, Fort Wayne, Indiana.

4. Defendant Pone Vongphachanh ("Pone"), is a resident of Allen County, Indiana, and at all times relevant to the controversy, was and continues to be an employee of Upstar and Upstar MLS.

5. Defendant Indiana Association of Realtors, Inc. ("IAR"), is an Indiana not-for-profit corporation, organized under the laws of the state of Indiana, representing member real estate agents, and is headquartered in Indianapolis, Indiana.

6. Defendant National Association of Realtors, Inc. ("NAR"), is an Illinois not-for-profit Corporation, organized under the laws of the state of Illinois, with headquarters in Chicago, Illinois, and representing member real estate agents through-out the United States of America.

7. NAR was registered as a foreign nonprofit corporation with the Indiana Secretary of State as of August 5, 1985, and named a registered agent address as Indiana Association of Realtors, 7212 N. Shadeland Ave., Indianapolis, Indiana 46000.

8. NAR, through some action or inaction on its part, allowed its registration as a foreign no-for-profit corporation in the state of Indiana to be revoked as of February 12, 1990.

9. NAR is actively doing business in Indiana, and is either exempted from or in violation of Indiana's foreign business registration requirement, IND. CODE § 23-1-49 et seq., and/or IND. CODE § 23-17-26-1 et seq.

10. NAR, is self-described as "the world's largest professional association."

11. NAR solicits (directly and indirectly) and accepts membership into its association from Indiana residents, including persons and business organizations.

12. NAR provides services to its Indiana members, which members include residential and commercial real estate brokers, salespersons, property managers, appraisers, counselors and others engages in all aspects of the real estate industry.

13. NAR collects dues from Indiana residents and uses such dues for the benefit of Indiana residents in the following particulars:

   a. NAR's Consumer Advertising Campaign which advertises on television and radio in Indiana, and which advocates and promotes its member REALTORS®;

   b. A program named REALTOR® Party Advancement Initiative which promotes state and local real estate and home ownership advocacy;

      c.      Lobbying and government affairs, political affairs, economics & research, regulatory affairs, RPAC (Realtors Political Action Committee), public affairs, consumer communications;

      d.      Internal programs named Second Century Initiatives: Realtors Property Resource®, HouseLogic, Real Estate Today Radio, .REALTOR domain (allowing Indiana member REALTOR® to build web sites and no additional cost), Commercial (eProperty Data);

      e.      Costs associated with legal expenses, member communications, international policy, commercial expenses, education, marketing, affinity partners, business specialties, wholly owned subsidiaries, and the Center for REALTOR® Technology.

14. Every Indiana real estate agent who is an association member of NAR is required to abide by NAR's ethical guidelines and to submit to an ethics training course.

15. Ethics training required by NAR of its association members in Indiana includes 2.5 hours of instructional time within two-year cycles, and may be completed through, *inter alia*, internet portal access (including from the state of Indiana), and in-person classroom courses conducted within the state of Indiana.

16. NAR provides training, direction, legal advice to Indiana state and local REALTOR associations.

17. NAR has contracted with, and works in conjunction with, local associations and with its membership to provide mandatory ethics courses within the state of Indiana.

18. NAR has contracted with Indiana associations Upstar, Upstar MLS, and/or IAR to provide automatic membership in NAR when individuals join the Indiana Associations, or each of them.

19. Members who join Upstar/Upstar MLA are also automatically billed for membership in NAR and IAR and become members of the same as a package, and are not given the choice to opt-out of membership in the state and national associations.

20. NAR also utilizes local associations, like Upstar and Upstar MLA, to raise money from its members to fund NAR's R-PAC (political action committee), and these local associations act as agents for NAR in their fund raising efforts.

21. NAR works closely and in conjunction with IAR, Upstate and Upstate MLS to advocate for and to provide services and benefits to Indiana members of the organizations.

22. NAR also solicits and maintains affiliate membership for Indiana residents, beyond real estate and direct real estate related businesses, such as banks, political policy makers, chambers of commerce, and mortgage companies.

## JURISDICTION AND VENUE

23. Plaintiff brings this claim under Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, to obtain equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1, as well as the Lanham Act §43(a) (15 USCA §1125), giving this court subject-matter jurisdiction arising from claims under the laws of the United States of America.

24. Plaintiff also brings claims under Indiana law, which claims arise from common facts associated with federal claims, and this Court has supplemental jurisdiction over these state law claims, under 28 U.S.C. §1367.

25. Venue is proper under 28 U.S.C. § 1391 (b).

## INTRODUCTION AND STATEMENT OF THE CASE

26. The Plaintiff is a corporation which originated in 2008, and engaged in providing relocation benefit plans to employers, unions, affinity groups and membership organizations which in turn are offered to employees, as union benefits or as affinity benefits.

27. Plaintiff's business model is based loosely on executive relocation services, which have historically been a service provided to corporate executives in assisting them in moving expenses and services, however it differs in salient ways.

28. The Plaintiff's specific service ("workforce relocations") provides a package of assistance not to executives *per se*, but instead to an average consumer.

29. Real estate agents are generally averse to the general model of executive relocation services, because they would often require the buyers' and sellers' agents to accept a lower commission in order to participate in the transaction.

30. The services of the Plaintiff, best identified as Employer Assisted Housing "EAH", include a bundle of benefits to participating members, including title work, relocation services, and also, the administration of taxable compensation to the buyer.

31. The taxable compensation to the buyer is funded through the buyer's act of negotiating a higher commission rate for the buyer's real estate agent, which expense is to be borne by the seller.  This item is negotiated in the same manner as other terms of the sale, like closing points, closing costs, and loan term requirements, etc.

32. Included in the negotiations is the handling of the buyer's, now higher, commission payment.

33. State and federal law allow real estate commissions to be negotiated.  The seller's agent, in order to allow plaintiff's plan to work, must agree as part of the overall bargain to pay the additional, negotiated, commission to the Plaintiff's in-house licensed real estate agent. These funds are then used by Plaintiff to cover the administration costs, including their in-house agent, and a portion of the funds are administered as taxable income to the buyer.

34. The funds administered to buyer can be used by the buyer in whatever manner he/she chooses, including meeting down payment requirements, or other costs.  Payments to the buyer prior to closing are treated as fully taxable income to the buyer.

35. The benefit service plan and the business model by which Plaintiff operates was established in 2008, and is in compliance with all federal and state laws.

36. Plaintiff has consulted with legal counsel and has interacted with the Indiana Real Estate Commissioner, Regulatory Ombudsman for the Indiana Economic Development Corporation and the U.S. Department of Housing and Urban Development and with other governmental agencies to insure that its operation is in compliance with the law.

37. Plaintiff is one among several companies who operate nationwide and locally which offer this type of benefit.

38. Plaintiff, in promoting their product and services, undertook to schedule a substantial rollout and on-site promotion in northeast Indiana on February 27, 2014.

39. The rollout involved hundreds of hours of preparation time and market testing by agents, employees and contractors of the Plaintiff, and also involved reaching out to and establishing good relationships with local businesses and government officials.

40. Plaintiff has incurred substantial costs and capital outlay in preparation of its rollout.

41. Plaintiff, in its overall business plan, and in its effort to promote the company, had worked with local government officials, who had planned on attending the roll out on February 27, 2014.

42. Among the individuals scheduled to attend the rollout were councilman Kevin Howell, who is an Allen County Councilman, and a Constituent Liaison for United States Congressman Marlin Stuzman. Councilman Howell, in his capacity as the Constituent Liaison, handled the arrangements for Congressman Stuzman to attend the rollout, and to speak in favor of such initiatives as those available through the Plaintiff's business.

43. The rollout was to be a showcase of how the Plaintiff could assist the general public in a way which promoted government policy consistent with those of the politicians scheduled to attend.

44. In the normal course of operation, Plaintiff periodically offers informational sessions explaining how their product and services operate, and how it can benefit individuals, employers, builders, real estate agents and others.  These sessions also inform prospective real estate agents interested in qualifying to participate in Plaintiff's services.

45. An informational session that also supported the rollout was conducted on February 19, 2014, in Fort Wayne, Indiana.

46. IAR, is a trade association, a state board affiliated with NAR, and provides services and represents the interests of state-wide member brokers.

47. NAR, is a trade association which establishes policies and standards for over one million individual member brokers throughout the United States, and provides education to these members and the public.

48. NAR and IAR members include traditional brokers are concerned that the activities of companies like that of the Plaintiff, might result in reduced overall commissions for themselves.

49. In April of 2010, Plaintiff's initial dealings with NAR was a contact from Holly Moskerintz, NAR's Community & Political Affairs Representative, and resident in charge of Employer

Assisted Housing (EAH). Ms. Moskerintz expressed an interest in promoting EAH programs, like the services offered by Plaintiff, and wanted details of how Plaintiff's plan worked. Plaintiff provided those details.

50. Approximately five (5) months later, after Ms. Moskerintz had an opportunity to review and vet Plaintiff's plan, Plaintiff was contacted again, and at that time, NAR expressed its desire to work with Plaintiff on promoting plans like the Plaintiffs, and to educate its members, and the general public on the benefits of EAH plans.

51. In order to promote EAH's, NAR provided a link from its own website directly to Plaintiff's website, directing its members and the consuming public to go there to get information on the benefits of EAH's.

52. NAR, through its representative Ms. Moskerintz, also enlisted Plaintiff's help in spreading the word about EAH's to its Indiana membership, because it was having trouble encouraging Indiana members to attend seminars or generally become educated on the programs.

53. In 2012, NAR extended an invitation to Plaintiff's representative, Ms. Henry, to attend a NAR seminar and to promote and answer questions about Plaintiff's EAH business model.

54. The Plaintiff, through their service, educate buyers and sellers of homes in Indiana that real estate commissions are subject to negotiation. This knowledge to the consumer is directly adverse to the goals of all defendants who prefer that consumers not know that they are able to negotiate such commissions.

55. Consumers do not have a platform to negotiate fees, and Plaintiff provides the education and necessary information to consumers that the way of doing business promoted by the defendants is not exclusive, and that using the services of the Plaintiff can be beneficial to consumers.

56. Plaintiff provided easy access to consumer information, agent training, agent certification, research material, administrative forms, interactive benefit transaction platforms and other tools to support their benefit product and service online.

57. Consumers had unrestricted access to general information and consumers were not required to use a specific real estate agent when they used their housing benefit. Plaintiff was very active in the real estate and home builders relevant market giving seminars on benefit use, setting up personalized access points and supporting network providers. Additionally

Plaintiff worked with lenders, government entities and officials who were interested in the benefits of using the Plaintiff's product and service to achieve their business goals

**Activities of Specific Defendants Reflecting Wrongdoing**

58. Participating members, including real estate agents, of Upstar and Upstar MLS, are given access to MLS (multiple listing service) with property listings in primarily 43 Indiana Counties. Participating members and receive the benefits of membership in of IAR and NAR.

59. At the outset of their dealings with Plaintiff, Upstar and Upstar MLS were ostensibly concerned that Plaintiff's service might violate laws prohibiting seller funded down payment assistance, and in 2009 in their capacity as an advocate for their members, contacted their legal counsel, William Swift, a Fort Wayne attorney.

60. A meeting was called, and included Ms. Henry, board members of the defendants, Rena Black, then-president of the association, and certain associate members for the purpose of discussing the specifics, the viability and the legality of the benefit product offered by Plaintiff.

61. Mr. Swift vetted the Plaintiff's benefit plan and determined that it was not in violation of any regulatory standard, and was not a seller funded down payment assistance program.

62. Within days of meeting with Ms. Henry and Upstar and Upstar MLS clients, Mr. Swift contacted Ms. Henry to ask her assistance in contacting local home builders to generate leads with her EAH benefit.

63. The board members and staff of these defendants were fully aware of their legal counsel's findings that Plaintiff's business model was legal and legitimate.

64. Contrary to the findings of their own attorney, Upstar and Upstar MLS circulated newsletters to its members and to the general consuming public that Plaintiff's program was indeed linked to illegal seller funded down payment assistance programs. See, **Exhibit 1.**

65. Upstar and Upstar MLS also sought the assistance of NAR as early as March of 2011, in an effort to discredit Plaintiff, and mislead consumers into believing that Plaintiff was a seller funded down payment assistance (SFDPA) program. Defendaants, and specifically, Pone (as an agent of Upsate and Upstate/MLS) and Holly Moskerintz (as an agent of NAR), and

other agents of these defendants, looked into possible HUD and FHA violations by the Plaintiff.

66. In her capacity as employee of the Defendants, Ms. Vongphachanh has held and holds the title of Public Affairs Officer.

67. Within the scope of her employment, Ms. Vongphachanh is charged with handling matters relating to contacts and activities of the Defendants with the local community, and with legislative and governmental affairs.

68. Within the scope of her employment, Ms. Vongphachanh is charged with representing her employers on external boards and committees and in the local community on matters of public policy, economic development and overall community relations.

69. Within the scope of her employment, Ms. Vongphachanh is charged with protecting the interest of the members of the association for which she works, and also for the real estate industry at large, in legislative matters.

70. Ms. Vongphachanh operates under the direction of the Defendants and each of them, including NAR, because she worked in conjunction and possible direction of NAR in efforts to harm the Plaintiff.

71. NAR, through their agents and employees, used their contacts with the Department of Housing and Urban Development to provide HUD with false information and to launch an investigation of the Plaintiff, knowing HUD had no oversight of the activities of the Plaintiff.

72. In 2011, HUD initiated an investigation of Plaintiff in Indiana, at the behest and prompting of NAR, IAR, Upstar, Upstar MLA, Moskerintz, Vongphachanh or each of them.

73. In the scope of the investigation, HUD contacted all of Plaintiff's clients informing them that they were conducting an investigation into possible wrongdoing by Plaintiff and by the clients individually.

74. The HUD contact with Plaintiff's network providers caused a mass exodus of these providers, including at least five major banks and mortgage lenders, and all of their branches, more than one hundred real estate network providers (including REALTORS and real estate agents), more than five title companies, and at least five major builders, After the investigation, only three network members remained.

75. It is Plaintiff's belief that HUD dropped its investigation in late spring of 2011.

76. After learning that HUD saw no basis for action against Plaintiff, NAR failed to inform other

        Defendants of this fact, and continued to work with the other Defendants and to provide false and misleading information about the Plaintiff's business and about HUD's involvement resulting in injury to the Plaintiff.

77. Plaintiff in its effort to mitigate damages, and rebuild its company after the disastrous affects of the HUD investigation prompted by Defendant's urging, worked closely with the Indiana Economic Development Corporation office of Fort Wayne.

78. In or about May of 2013, Vongphanchanh and Moskerintz again decided to target the Plaintiff, and the course of manufacturing a campaign against Plaintiff, consulted with Ralph Holman, general counsel for NAR.  It was their hope that he might identify some illegal practice by Plaintiff.

79. On or about May 30, 2013, attorney Holman spoke to Ms. Moskerintz regarding the operation of the Plaintiff.  Ms. Moskerintz confirmed, in an email to Ms. Vongphanchanh that Holman told her "It seems there (sic) Workforce Relo [Plaintiff] isn't doing anything legally wrong and there is not really any legal action for NAR to pursue."  Ms. Moskerintz confirms her counsel's conclusion and that in her opinion "at this point, it appears there is nothing we can do." **Exhibit 2**.

80. With advice and counsel of attorney Swift, and attorney Holman, Upstate/Upstate MLS and NAR, in a calculated and collusive manner, again in 2014, continued their campaign to damage the Plaintiff and to deny consumers access to their competing service.

81. Ms. Vongphachanh, in the scope of her employment, attended Plaintiff's February 19, 2014 information session (which Plaintiff presented in anticipation of a February 27 rollout and promotion of its business), in Fort Wayne, Indiana.

82. Within hours or minutes of attending the informational session, Ms. Vongphachanh, contacted councilman Howell, and without any basis in fact informed him that Plaintiff was operating an illegal down payment assistance program, and that Plaintiff was an illegal company.  Defendants, acting through their agent Ms. Vongphachanh and or others, also threatened Councilman Howell and stated that if he or congressman Stutzman attended the Plaintiff's rollout, Ms. Vongphachanhe would send out an email blast to local real estate agents and others, informing them that Howell and Stutzman were working with an illegal company.

83. As a part of the plan or scheme to damage plaintiff, Ms. Moskerintz, as agent of NAR, on

or before February 20, 2014, consulted with Sarah C. Young, another agent or employee of NAR, regarding further additional investigation into the dealings of the Plaintiff.  Ms. Moskerintz did this with full knowledge that NAR's counsel had previously informed her that Plaintiff "isn't doing anything legally wrong."  In a email transmission to Ms. Young on same date, Moskerintz refers to Plaintiff representative, Kim Henry, as "very deceptive and manipulative."  See **Exhibit 2**.

84. On February 20, 2014, Ms. Vongphanchanh submitted an email to Kathie Green (assistant to Congressman Stutzman at the time).  See, **Exhibit 3**. In that email, Ms. Vongphanchanh stating that "seller-assisted down payment programs are illegal," which is generally correct. The email continued on to state that Plaintiff's program could not be supported by Upstar because "it was a seller-funded program."

85. Ms. Vongphanchanh failed to mention to Ms. Green, however, that two attorneys working for Upstar and NAR respectively had advised them that Plaintiff was not doing anything illegal, that HUD had reviewed the case and took no action against Plaintiff, thus conveying to representative Stutzman representative the clear impression that they were engaged in illegal activity.

86. Upstate/Upstate MLS and NAR, through their agents, again decided to arrange a meeting with employees and agents of these defendants to discuss how to approach HUD regarding the Plaintiff's activities, and on February 24, 2014, these Defendants did conduct a conference call with HUD, again trying to discredit Plaintiff, and to promote legal and enforcement action against Plaintiff.

87. To Plaintiff's knowledge, no action was ever taken by HUD in relation to Plaintiff's activities.

88. On March 4, 2014, and at the behest of Vongphanchanh and Moskerintz, Sarah C. Young published an article to post on NAR's official website, discussing seller assisted down payments. See, **Exhibit 4**.  This article was written specifically for use to attack the Plaintiff, even though Plaintiff is not specifically identified in the article.

89. The consuming public, who directed questions or concerns to the Defendants about the Plaintiff, were directed to this article which gave a clear perception that Plaintiff was operating an illegal seller assisted down payment plan, which it was not.

90. Plaintiff's program does not, nor was it ever fall into the category of improper or illegal a

seller-assisted down payment programs.

91. The Defendants, through acts of libel and slander, maligned and defamed the Plaintiff to a sitting member of the United States House of Representatives, a sitting member of the Allen County Council, to parties contracting with Plaintiff, to parties in a business relationship with the Plaintiff, and to the general public, and maliciously and without justification threatened to associate a Congressman and a Councilman with criminal activity if either decided to show support for the work of the Plaintiff.

92. Immediately after Ms. Vongphachanh made the threats to these government officials, they withdrew their support of the Plaintiff's rollout, and refused to attend the same.

93. Plaintiff believes that at least two substantial potential contracts, in which Plaintiff invested substantial time and money, were lost as a direct result of the false accusations of criminal activity which Defendants disseminated to these potential customers.

94. The Defendants were approached by Plaintiff and were asked to issue a written retraction of the false accusations of criminal activity on the part of the Plaintiff.

95. The Defendants refused to issue any type of retraction, and instead condoned the actions of their employee or employees and informed Plaintiff that Ms. Vongphachanh was only doing the job she was paid to do.

96. As a result of the actions and inactions of the Defendants Plaintiffs have suffered and continue to suffer damages.

97. The actions of Ms. Vongphachanh were done within the scope and employment of the Defendants, and Defendants are responsible for the actions of their employee, Ms. Vongphachanh under a *respondeat superior* relationship of the parties.

98. IAR publishes a newsletter regularly, which is distributed to its members, and possibly to the public at large.

99. Since the filing of the Plaintiff's original Complaint, Plaintiff has learned that in May of 2011, IAR published a defamatory letter in its newsletter, authored by its staff counsel, in which IAR's counsel directly mentions the Plaintiff's company, and casts doubt as to the propriety of the services being offered by the Plaintiff, identifies laws which Plaintiff is likely violating and disparages Plaintiff to IAR members.  A copy of the offending newsletter is attached as **Exhibit 5.**

100. In August 2012, IAR president, Charlie Shook, who was also the Indiana Real Estate Commissioner at the time, reviewed Plaintiff's benefit plan and determined that it was not violative of any laws, and that it was a worthwhile program.

101. Mr. Shook recognized that the consumer would benefit from this plan.

102. IAR did not remove the May 2011 defamatory information from its web site until 2016.

103. Upstar and Upstar MLS reported to NAR about the activities of Plaintiff, and worked in concert with NAR and IAR to undermine the business success of the Plaintiff through a continued campaign of misinformation calculated to malign the Plaintiff and to cause it harm.

104. The actions of the Defendants, and each of them, resulted in driving Plaintiff out of business.

105. Defendants orchestrated activity against Plaintiff was intentionally covered up in order to deflect any appearance of wrongdoing.

106. The Defendants took actions against Plaintiff for the purpose of unfairly and illegally protecting themselves and their members from outside competition.

107. Defendants promoted and encouraged a specific business model in relation to commissions and the involvement of real estate agents.

108. Defendants promoted a code of silence when it came to informing the general public that they have a right to negotiate broker commissions on the sale of real estate.

109. Plaintiff created a plan which involved a different business model than the one promoted by the Defendants, which model was in direct competition with the model advocated promoted by the Defendants.

110. Plaintiff's business model encouraged the renegotiation of commissions in order to legally allow consumers to buy and sell real estate that they may not have otherwise been able to undertake.

111. Plaintiff's business plan was beneficial to the general consuming public.

112. Plaintiff's business model directly conflicts with Defendants' business model, and Defendant took active steps through a disinformation campaign to eradicate Plaintiff from the market.

113. The Defendants actions in disparaging Plaintiff, and implementing policies to prevent Plaintiff from entering into the market, amount to a restraint of competition.
114. Defendants repeatedly mislabeled Plaintiff's business plan as an illegal seller funded down payment assistance.
115. The blocking of Plaintiff from entering into the market and/or driving Plaintiff out of business is fundamentally anti-competitive and harmful to the consuming public.
116. The Defendants, individually, collectively or in some combination, banded together to stop Plaintiff from entering into the market before it became a larger threat to their business of collecting commissions on real estate sales.
117. The Defendants actions include false and misleading statements which were designed to prevent Plaintiff from providing a critical service to the consuming public and therefore maintaining an exclusive non-competitive environment for their benefit.
118. The Defendants have through a combination of acts and by conspiracy, incorporated illegal and suppressive measures to prevent an innovative business model from forming and thriving in the market, and have acted to restrain trade.
119. The efforts of the Defendants, whether individually or in some combination of actors, promoted a boycott of Plaintiff's services.
120. The efforts of the Defendants, whether individually or in some combination of actors, have had direct anti-competitive effects on the market.
121. The consumers and potential consumers of Plaintiff's services who have been adversely affected by the Defendants' actions include buyers of homes from 2011 to present, and who had the opportunity to participate in Plaintiff's program.
122. The Plaintiff offered a service to the general consuming public which was beneficial, and is not available any longer.

### CAUSES OF ACTION

### Count I
### Libel *Per Se*

123. Plaintiff restates paragraphs 1-122, inclusive, as if fully set forth herein.
124. The false written communications by the Defendants alleging criminal activity on the part

of Plaintiff and determinated publicly are libelous and defamatory *per se*.

125. The defamatory communication of the Defendants caused harm to the reputation of the Plaintiff and lowered the position of the Plaintiff in the estimation of the community, and deterred third persons from associating or dealing with the Plaintiff.

126. The defamatory written statements made by Defendants resulted in actual business losses and monetary damages, and Plaintiff is entitled, in addition to nominal damages, to special or compensatory damages as a result of the libelous statements of the Defendants.

127. Defendants' actions against the Plaintiff were intentional, calculated to injure the Plaintiff, grossly negligent and oppressive.

## Count II
## Slander *Per Se*

128. Plaintiff restates paragraphs 1-127, inclusive, as if fully set forth herein.

129. The false oral communications by the Defendants alleging criminal activity on the part of Plaintiff and determinated publicly are slanderous and defamatory *per se*.

130. The defamatory statements of the Defendants caused harm to the reputation of the Plaintiff and lowered the position of the Defendant in the estimation of the community, and deterred third persons from associating or dealing with the Plaintiff.

131. The defamatory oral statements made by Defendants resulted in actual business losses and monetary damages and Plaintiffs are entitled, in addition to nominal damages, to special or compensatory damages as a result of the slanderous statements of the Defendants.

132. Defendants' actions in making false oral statements against the Plaintiff were intentional, calculated to injure the Plaintiff, grossly negligent and oppressive.

## Count III
## Tortious Interference of Contract

133. Plaintiff restates paragraphs 1-132, inclusive, as if fully set forth herein.

134. At the time of the wrongdoing of the Defendants, Plaintiff was a party to several valid contracts.

135. Defendant had actual or constructive knowledge of Plaintiff's contractual relationship with other parties.
136. Defendants, by their actions, induced a breach of such contract or contracts without justification.
137. Defendants' actions resulted in injuries to the Plaintiff.
138. Defendants' actions justify the award of punitive damages to the Plaintiffs.

### Count IV
### Tortious Interference with Business Relationship

139. Plaintiff restates paragraphs 1-138, inclusive, as if fully set forth herein.
140. At the time of the wrongdoing of the Defendants, Plaintiff had established numerous business relationships in the community.
141. Defendant had actual or constructive knowledge of Plaintiff's business relationship with other parties.
142. Defendant, by their actions, intentionally interfered with Plaintiffs business relationships without justification.
143. Defendants' actions resulted in injuries to the Plaintiff.
144. Defendants actions justify the award of punitive damages to the Plaintiffs.

### Count V
### Negligent Training Supervision and Retention

145. Plaintiff restates paragraphs 1-144, inclusive, as if fully set forth herein.
146. Defendant Vongphachanh was assigned numerous duties which exposed her and her employer to extraordinary contact and interaction with the public, the government and local businesses.
147. Defendants owed a duty of care, when dealing with local businesses, not to malign or otherwise adversely and falsely accuse such businesses of operating in a manner contrary to law, which duty was breached and resulted in injury to Plaintiff.
148. Defendants Upstar and Upstar MLS were negligent in training and supervising Ms.

       Vongphachanh in the proper manner in which to interact with the general public, with local businesses and with government officials.

149. Defendants Upstar and Upstar MLS were negligent in retaining Ms. Vongphachanh as an employee.

150. Defendants' actions resulted in injuries to the Plaintiff.

151. Defendants actions justify the award of punitive damages to the Plaintiffs.

### Count VI
### Punitive Damages

152. Plaintiff restates paragraphs 1-151, inclusive, as if fully set forth herein.

153. Defendants intentionally and with malice, gross negligence, and oppression caused injury to the Plaintiff.

154. In addition to special and compensatory damages, Plaintiff is entitled to recover punitive damages from the Defendants.

### Count VII
### Lanham Act Violations

155. Plaintiff restates paragraphs 1-155, inclusive, as if fully set forth herein.

156. The Defendants have made false and misleading representations of fact in oral and published statements to the public and to member real estate brokers.

157. The misrepresentations made by Defendants are material in that they have deceived or are likely to deceive member brokers and home buyers in whether to deal or contract with Plaintiff.

158. Defendants' misrepresentations are material in that they have deceived or have a tendency to deceive a substantial segment of its audience.

159. The Defendants directly and indirectly mislabeled Plaintiff's business plan as an illegal seller funded down payment assistance.

160. The Defendants placed false or misleading statements in interstate commerce of the United

States.

161. Plaintiff has been injured as a result of Defendants' misrepresentations which directly diverted sales or potential sales of service Plaintiff provided to the consuming public, and by aerating of goodwill associated with Plaintiff's services.

162. Plaintiff's have been driven out of business, and have suffered losses, including lost business opportunity, lost profits, and lost future profits.

163. Defendants have violated provisions of the Lanham Act §43(a) (15 USCA §1125), entitling Plaintiff to relief under the Act.

### Count VIII
### Sherman Act Violations

164. Plaintiff restates paragraphs 1-163, inclusive, as if fully set forth herein.

165. Defendants have violated provisions of the Sherman Act (15 USCA §1, et. seq.), entitling Plaintiff to relief under the Act.

166. In the concerted actions of the Defendants, there was a conscious commitment to a common scheme designed to achieve an unlawful objective that constitutes a contract, combination or conspiracy (the "Conspiracy").

167. Plaintiff's collective efforts were designed for the express purpose of retraining trade in order to promote their own business model (and to benefit their members) to the exclusion of a competitive business which posed a threat, whether actual or perceived, to the earning capabilities of its members, but which deprived the consumers of choice, and which retrained trade generally.

168. The Conspiracy has existed for several years, and continued through the time the Plaintiff was driven out of business, and may continue to this day to prevent reentry into the market.

169. The Conspiracy's unlawful objective was, and may continue to be, to impose unreasonable restraints of trade in state and local real estate markets in which Plaintiff was operating.

170. The Conspiracy's unlawful objective was to directly and indirectly inhibit competition in the market, to inhibit innovation in the delivery of information and services to a consuming public, and illegally preserve and protect their own benefit and profit from services.

171. The collective action and individual actions of the Defendants deprived Plaintiff of its ability to engage in free enterprise, and harmed and deprived the market generally of free enterprise.
172. The anti-competitive acts of the Conspiracy have directly harmed competition and have injured Plaintiff's sales and goodwill in an amount to be determined.

## Count IX
## Indiana Fair Trade Regulations

173. Plaintiff restates paragraphs 1-173, inclusive, as if fully set forth herein.
174. The actions of the Defendants are in violation of the Indiana Fair Trade Regulations, IND. CODE § 24-1-1-1 et. seq., entitling Plaintiff to relief under the Act.

**WHEREFORE,** Plaintiffs demand judgment against the Defendants for pecuniary and special damages occasioned by the acts of the Defendants, for exemplary damages, for all statutory damages, for treble damages, for attorney fees, for costs, and for all other relief proper in the premises.

**LAW OFFICE OF GEORGE SISTEVARIS**
**ATTORNEYS FOR PLAINTIFF**
**202 WEST BERRY STREET, SUITE 500**
**FORT WAYNE, INDIANA 46802**
**TELEPHONE: (260) 420-0900**
**FAX: (888) 523-9003**
**EMAIL: george@sistevaris.com**

BY:   /s/ George Sistevaris
      **GEORGE SISTEVARIS**
      **INDIANA ATTY. #13770-02**

Z:\Workforce Relo\Complaint Amended 3.wpd.            19

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's System.

>David J. Theising, Esq.
>dtheising@harrisonmoberly.com
>
>John E. Kolas, Esq.
>jek@kolaslaw.com
>
>E. Franklin Hill, Jr., Esq.
>ef_hill@yahoo.com

>/s/ George Sistevaris
>**GEORGE SISTEVARIS**