**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

DATA RESEARCH AND HANDLING, INC.,   )
                                           )
        Plaintiff,                   )
                                           )
v.                                        )     Case No. 1:16-CV-392
                                         )
PONE VONGPHACHANH, INDIANA    )
ASSOCIATION OF REALTORS, INC.,    )
UPSTATE ALLIANCE OF REALTORS,   )
INC., UPSTATE ALLIANCE ASSOCIATION )
MULTIPLE LISTING SERVICE, INC., and  )
NATIONAL ASSOCIATION OF REALTORS )
INC.,                                     )
                                         )
        Defendants.

## OPINION AND ORDER

This matter is before the Court on the motion to dismiss and memorandum in support filed by Defendant National Association of Realtors, Inc. (ECF 74 and 75). Plaintiff Data Research and Handling, Inc., filed a response in opposition (ECF 81) and NAR filed a reply (ECF 88). For the reasons discussed below, the motion is GRANTED and the Plaintiff's claims against the NAR are dismissed. The Plaintiff's claims against the remaining Defendants are unaffected by this Order and remain pending.

## STANDARD OF REVIEW

Defendant NAR moves the Court to dismiss the Plaintiff's claims against it "for lack of personal jurisdiction over NAR pursuant to Fed.R.Civ.P. 12(b)(2) and for improper venue as to NAR pursuant to Fed.R.Civ.P. 12(b)(3)." Motion to Dismiss, p. 1. The NAR filed a previous motion to dismiss based on these same arguments (and more), but the Court deemed that motion moot after granting Data Research and Handling's motion to file a Second Amended Complaint.

Opinion and Order, Sept. 30, 2017 (ECF 65). The Court explained in that order that "the NAR's jurisdictional arguments will have to be presented anew in a subsequent motion[.]" *Id.*, p. 21, n. 4. The NAR's present motion does just that by challenging the Plaintiff's *Second* Amended Complaint under Rules 12(b)(2) and (3).[1] Memorandum in Support, p. 3. The NAR argues that the Plaintiff's recently amended pleading failed to cure these jurisdictional issues and as a result the Plaintiff cannot pursue its claims against the Association.

When a defendant moves to dismiss a complaint under Federal Rule 12(b)(2) for lack of personal jurisdiction, "[t]he plaintiff bears the burden of showing that personal jurisdiction over the defendant exists." *Claus v. Mize*, 317 F.3d 725, 727 (7th Cir. 2003). When the Court "rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing . . . the plaintiff 'need only make out a prima facie case of personal jurisdiction.'" *Purdue Research v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (quoting *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). A federal district court has personal jurisdiction over a defendant "only so long as the defendant is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Northern Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). Indiana Trial Rule 4.4(A), Indiana's "long-arm" provision, expands personal jurisdiction to the full extent permitted by the Due Process Clause. *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 965-66 (Ind. 2006). "Thus, the statutory question merges with the constitutional one–if [Indiana] constitutionally may exercise personal jurisdiction over a defendant, its long-arm statute will enable it to do so."

---

[1] Because the Court finds that the Rule 12(b)(2) personal jurisdiction issue is dispositive it need not reach the Defendant's alternative argument under subsection (b)(3) regarding improper venue.

*Northern Grain*, 743 F.3d at 492.

Personal jurisdiction comes in two forms–specific or general. The Seventh Circuit has explained that "federal constitutional law draws a sharp and vital distinction between two types of personal jurisdiction: specific or case-linked jurisdiction, and general or all-purpose jurisdiction." *Abelesz v. OTP Bank*, 692 F.3d 638, 654 (7th Cir. 2012). Which one applies, if either, turns on the type of contact the defendant had with the forum state. The Seventh Circuit explained it as follows:

> If the defendant's contacts are so extensive that it is subject to general personal jurisdiction, then it can be sued in the forum state for any cause of action arising in any place. More limited contacts may subject the defendant only to specific personal jurisdiction, in which case the plaintiff must show that its claims against the defendant arise out of the defendant's constitutionally sufficient contacts with the state.

*uBID, Inc. v. GoDaddy Group, Inc*., 623 F.3d 421, 425 (7th Cir. 2010).

In 2011, the Supreme Court clarified that general jurisdiction cannot be premised solely upon "continuous and systematic" contacts with a forum state; instead, general jurisdiction exists only "when [defendants'] affiliations with the State are so 'continuous and systematic' as to render them *essentially at home in the forum State*." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 914, 919, 131 S.Ct. 2846, 2851 (2011) (italics added). In January of 2014, the Supreme Court reaffirmed its adherence to this new "at home" standard, holding that an argument that general jurisdiction was appropriate over any corporation that engages in substantial, continuous, and systematic business in a foreign state was "unacceptably grasping." *Daimler AG v. Bauman*, 571 U.S. – , 134 S.Ct. 746, 760-61 (2014). The *Daimler* court reiterated the "at home" standard and stated that the affiliation between the defendant and the forum state

3

must be so continuous and systematic that the defendant is "comparable to a domestic enterprise in that State." *Id.*, 134 S.Ct. at 758 n. 11.

The Supreme Court noted that "[t]he 'paradigm' forums in which a corporate defendant is 'at home,' . . . are the corporation's place of incorporation and its principal place of business." *BNSF Ry. Co. v. Tyrrell*, 137 S.Ct. 1549, 1558 (2017) (citing *Daimler*, 134 S.Ct. at 760; *Goodyear*, 564 U.S. at 924, 131 S.Ct. at 2846). The Supreme Court did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business, but it stated expressly that a defendant can be subjected to general jurisdiction in some other forum only in an "exceptional case." *Daimler*, 134 S.Ct. at 761. As this Court has noted, "[a]fter *Goodyear* was decided in 2011, courts in this circuit have rarely found general jurisdiction to exist." *NExTT Solutions, LLC v. XOS Technologies, Inc.*, 71 F.Supp.3d 857, 861-62 (N.D. Ind. 2014).

## DISCUSSION

### I. Summary of allegations and claims.

The underlying facts of this case, disputed and undisputed, are set out in detail in the parties' pleadings and summarized in this Court's previous order of September 30, 2017. At this juncture, only an abbreviated summary of Plaintiff's allegations and claims is necessary. Data Research, an Indiana corporation, is "engaged in providing relocation benefit plans to employers, unions, affinity groups and membership organizations which in turn are offered to employees, as union benefits or affinity benefits." Second Amended Complaint (ECF 66), p. 4. Data Research was planning to launch a program designed to provide financial assistance to individuals purchasing homes, known as an Employer-Assisted Housing Benefit Plan. Data Research alleges

that the Defendants engaged in coordinated efforts to damage Plaintiff's business by defaming

Data Research just as it was about to launch a major marketing initiative consisting of a

"substantial rollout and on-site promotion in northeast Indiana on February 27, 2014." *Id.*, p. 5.

According to Data Research, the Defendants ruined the planned rollout by telling others that

"Plaintiff was operating an illegal down payment assistance program, and that Plaintiff was an

illegal company." *Id.*, p. 10. Data Research claims that the Defendants communicated these

assertions "to parties contracting with Plaintiff, to parties in a business relationship with the

Plaintiff, . . . to the general public," and even to a U.S. Congressman. *Id.* Data Research claims

that the Defendants' conduct was deliberate and calculated to suppress market competition.

Plaintiff's case is summarized by the following sentence from its Second Amended Complaint:

"The Defendants have, through a combination of acts and through conspiracy, incorporated

illegal and suppressive measures to prevent an innovative business model from forming and

thriving in the market, and have acted to restrain trade." *Id.*, p. 14. Based on those allegations,

Data Research asserts state law claims against the Defendants for libel *per se*; slander *per se*;

tortious interference with contract; tortious interference with a business relationship; negligent

training, supervision and retention; and violations of the Indiana Fair Trade Regulations, I.C. §

24-1-1-1, *et seq. Id.*, pp. 14-17, 19. Data Research also asserts federal claims for violations of the

Lanham Act, 15 U.S.C. § 1125 *et seq.*, and violations of the Sherman Act, 15 U.S.C. § 1, *et seq.*

*Id.*, pp. 17-19.

    This case involves several parties and several claims, but the only issue before the Court

now is the NAR's contention that it is not subject to personal jurisdiction in this Court, even if

Plaintiff's allegations are taken as true, and the burden is on Data Research to prove otherwise.

**II. General jurisdiction.**

Defendant NAR contends that the doctrine of general jurisdiction does not apply in this case because the "NAR is a trade association of real estate professionals incorporated as a non-profit corporation in the State of Illinois," has offices "in Chicago, Illinois, and . . . Washington, D.C. . . . does not have any office or place of business in the State of Indiana and does not have any employees working in Indiana." Memorandum in Support, p. 6. The NAR also states that it "does not hold a business license or certificate of authority to transact business in the State of Indiana, is not registered to do business in the State of Indiana, and has not appointed a resident agent for service of process in the State[.]" *Id*. The Association explains that it "has over 1.2 million members located in all 50 States, with approximately 16,000 of those located in Indiana." *Id*. Based on these facts, the NAR argues that it "is not 'at home' in Indiana. . . . Viewing NAR's contacts in their entirety, its Indiana contacts are no different than it contacts with 48 other states that it operates in without employees and offices. . . . Given the similarity of NAR's contacts in Indiana with 48 other states that it operates in and NAR's lack of employees and property in Indiana, NAR cannot be subject to general jurisdiction." *Id*., pp. 7-8. The NAR notes that "[t]he general jurisdiction inquiry 'calls for the appraisal of a corporation's activities in their entirety, nationwide and worldwide' because 'a corporation that operates in many places can scarcely be deemed at home in all of them.'" *Id*., p. 7 (quoting *Daimler*, 134 S.Ct. at 762, n. 20; *NexTT*, 71 F.Supp.3d at 865).

Data Research insists that this Court can exercise both general and specific jurisdiction over the NAR. Plaintiff's Response, pp. 4-12. As to the former, Data Research argues that the "NAR has a continuing contact with Indiana. It provides substantial services and conducts

training of its members within the state." *Id*. Data Research notes the fact that the NAR "collect[s] dues from 16,000 individuals and businesses in the state of Indiana[,]" and "provides services to its Indiana members[.]" *Id*., pp. 5-6. These services include "NAR's Consumer Advertising Campaign[,]" which advertises on television and radio in Indiana, and which advocates and promotes its member realtors[,]" its "[l]obbying and governmental affairs, political affairs, economics [and] research, regulatory affairs, RPAC (Realtors Political Action Committee), public affairs, [and] consumer communications[.]" *Id*., p. 6. Data Research also notes that the "NAR also requires, as a condition of membership, that its members 'abide by NAR's ethical guidelines and to submit to an ethics training course.'" *Id*. Data Research says that the "NAR has contracted with Indiana associations Upstar, Upstar MLS, and/or [Indiana Association of Realtors] to provide automatic membership in NAR when individuals join the Indiana Associations, or each of them." *Id*., p. 7. These activities, claims Data Research, establish that the "NAR has a continuing contact with Indiana. It provides substantial services and conducts training of its members within the state." *Id*. According to Data Research, these "contacts" are sufficient–meaning *constitutionally* sufficient–to subject the NAR to the jurisdiction of the courts of this state, including this Court.

The Plaintiff's arguments regarding general jurisdiction are unavailing. Data Research argues that the NAR's activities, such as collecting dues from members and providing services to them in exchange (including governmental lobbying efforts, continuing education programs, and so forth) are substantial and continuous enough, *specifically in Indiana*, to permit this Court to assert personal jurisdiction over the Association. The NAR argues that "its Indiana contacts are no different than its contacts with 48 other states that it operates in . . . ," and that it "solicits,

collects dues from, and provides services to its members in 48 states no differently than it does in Indiana." Defendant's Memorandum, pp. 7-8.

The flaw in Data Research's argument, as the NAR points out, is that "general jurisdiction is no longer premised solely on 'continuous and systematic" contact with the forum state; instead, general jurisdiction exists only when a defendant's 'affiliations with the State are so continuous and systematic' *as to render them at home in the forum State*." Defendant's Reply, p. 5 (quoting *NExTT*, 71 F.Supp.3d at 861) (citing *Daimler*, 134 S.Ct. at 746, and *Goodyear*, 564 U.S. at 924) (italics added). As the NAR also points out, the Supreme Court's directive was clear: "a corporate defendant such as NAR is only subject to general jurisdiction outside its state of incorporation or principal place of business in an 'exceptional case.'" *Id*. (quoting *Daimler*, 134 S.Ct. at 761, n. 19). This is not such an exceptional case, claims the NAR, and the "NAR's contacts with Indiana simply do not meet the more demanding standards for general jurisdiction set forth by the Supreme Court in *Goodyear*, *Daimler*, and, just a few months ago, *BNSF Ry.* [*v. Tyrrell*], and their progeny in the Seventh Circuit." *Id*., p. 8.[2] The NAR points out that

---

[2] In *BNSF Ry. Co.*, the Supreme Court held that the defendant railroad was not "at home" in Montana, for purposes of personal jurisdiction under that state's long-arm statute, even though BNSF "has 2,061 miles of railroad track in Montana (about 6% of its total track mileage of 32,500), employs some 2,100 workers there (less than 5% of its total work force of 43,000), generates less than 10% of its total revenue in the State, and maintains only one of its 24 automotive facilities in Montana (4%)." In *BNSF*, the plaintiff alleged that her deceased husband "had developed a fatal kidney cancer from his exposure to carcinogenic chemicals while working for BNSF[,]" and brought a FELA claim against the company in Montana state court. The Montana Supreme Court concluded that BNSF was subject to general jurisdiction in the state because it conducted business in the forum. The Supreme Court reversed, reiterating once again that "in-state business, we clarified in *Daimler* and *Goodyear*, does not suffice to permit the assertion of general jurisdiction over claims . . . that are unrelated to any activity" the defendant conducts in the forum state. *BNSF Ry. Co*, 137 S.Ct. at 1559 (2017). The plaintiff did not allege that plaintiff's decedent ever worked for BNSF in Montana, and so the Court concluded that her FELA claim was unrelated to the railroad's general (and statistically minimal) operations in the

"Plaintiff's Response Brief does not address or even once mention *any* of these controlling Supreme Court decisions." *Id*., p. 3.

The NAR is correct on all points. Data Research claims that the NAR's general activities in Indiana constitute "continuous and systematic" contacts with the state. But *Goodyear* and *Daimler* make clear that more is required before a state or federal court can toss a lasso over a foreign corporation, pull it into court, and force it to respond to an in-state plaintiff's claims. The NAR, relying on *Goodyear* and the Seventh Circuit's decision in *uBID, Inc. v. GoDaddy*, insists that its "contacts are not enough to subject NAR to general jurisdiction in Indiana." Defendant's Memorandum, p. 7 (citing *Goodyear*, 564 U.S. at 920) ("A corporation's 'continuous activity of some sorts within a state,' *International Shoe* instructed, 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'"); *uBID, Inc.*, 623 F.3d at 426 ("defendant who marketed and sold registrations for internet domain names, contracted with hundreds of thousands of Illinois customers, and hosted web sites accessible from Illinois, was not subject to general jurisdiction in Illinois.")); *see also*, *Elayyan v. Sol Melia, SA*, 571 F.Supp.2d 886, 900 (N.D. Ind. 2008) ("The mere fact that a state's resident can access a defendant's website does not subject a nonresident defendant to general jurisdiction in that state.").

---

state–activities that were similar to its operations in 27 other states. The Court concluded that BNSF was *not* "so heavily engaged in activity in Montana 'as to render [it] essentially at home' in that State." *Id*. The NAR presses the same argument here–that its activities in Indiana, as alleged by Data Research (and taken as true for present purposes), are too tenuous to subject the Association to general personal jurisdiction in this state. The NAR argues that its presence in Indiana is minimal, especially since the NAR has no offices, property or employees in this state, and so it is not "at home" here for purposes of general jurisdiction. Defendant's Memorandum, pp. 7-8.

Data Research fails to carry its burden of establishing that the NAR is sufficiently "at home" in Indiana so as to subject it to personal jurisdiction in this Court. The NAR's activities in this state consist of collecting dues from Indiana real estate professionals and businesses who choose to join the Association, and offering various services in exchange (such as seminars and marketing and advertising opportunities). The NAR does indeed maintain a "presence" in this state, at least in a generic and tenuous sense, but that presence does not render the Association "at home" in Indiana under the applicable due process standard. Data Research's failure to meet its burden of proving personal jurisdiction over the NAR, whether general or specific, becomes even clearer when the Plaintiff's assertions and allegations are scrutinized under the latter doctrine.

**III. Specific jurisdiction.**

While Data Research argued the issue of general jurisdiction, the company relies more heavily on the doctrine of specific jurisdiction to oppose the motion to dismiss. According to Data Research, the NAR's actions–specific to the circumstances of this case–were such that it can be haled into this Court to answer for its alleged tortious conduct even in the absence of general jurisdiction. Data Research argues that the NAR engaged in specific, intentional tortious conduct that harmed an Indiana plaintiff, thereby subjecting itself to the jurisdiction of this Court.

In support of its position, Data Research argues that its "complaint sets out specific activities of NAR that directly involved Plaintiff and that have caused the plaintiff injuries and that have arisen from forum-related activities." Plaintiff's Response, p. 9. Once again Data Research presents a "laundry list" of alleged activities in an effort to establish that specific jurisdiction exists in this case. *Id*., pp. 9-11. This list is lengthy and packed with factual assertions and allegations that Data Research uses to add skin and bone to the skeleton of its

case, which is that the Defendants, including the NAR of course, conspired to ruin the Plaintiff's efforts to market its product. But the only factual assertions that are relevant now are those that are *specific* to NAR and *specific* to the Plaintiff's claims. With that focus in mind, a summary of the relevant assertions and allegations presented by Data Research includes the following:

1) "In April of 2010, . . . Holly Moskerintz, NAR's Community & Political Affairs Representative" contacted Data Research and "expressed an interest in promoting EAH programs, like the services offered by Plaintiff, and wanted details of how Plaintiff's plan worked. Plaintiff provided those details." Plaintiff's Response, p. 9 (quoting Second Amended Complaint, ¶ 49).

2) About "five months later . . . Plaintiff was contacted again, and at that time, NAR expressed its desire to work with Plaintiff on promoting plans like the Plaintiff's, and to educate its members, and the general public on the benefits of EAH plans." *Id*. (quoting Second Amended Complaint, ¶ 50).

3) At some point, "NAR provided a link on its own website directly to Plaintiff's website[.]" *Id*. (quoting Second Amended Complaint, ¶ 51).

4) "In 2012, NAR extended an invitation to Plaintiff's representative, Ms. Henry, to attend a[n] NAR seminar and to promote and answer questions about Plaintiff's EAH business model." *Id*. (quoting Second Amended Complaint, ¶ 53).

5) "Upstar and Upstar MLS . . . sought the assistance of NAR as early as March of 2011, in an effort to discredit Plaintiff, and mislead consumers into believing that Plaintiff was a seller funded down payment assistance . . . program. Defendants, and specifically, [Vongphachanh] . . . and Moskerintz . . . and other agents of these defendants, looked into possible HUD and FHA

violations by the Plaintiff." Plaintiff's Response, p. 10 (quoting Second Amended Complaint, ¶ 65).

6) "Ms. Vongphachanh operates under the direction of the Defendants and each of them, including NAR, because she worked in conjunction and possible direction of NAR in efforts to harm the Plaintiff." *Id*. (quoting Second Amended Complaint, ¶ 70).

7) "NAR, through their agents and employees, used their contacts with the Department of Housing and Urban Development to provide HUD with false information and to launch an investigation of the Plaintiff, knowing HUD had no oversight of the activities of the Plaintiff." *Id*. (quoting Second Amended Complaint, ¶ 71).

8) "In 2011, HUD initiated an investigation of Plaintiff in Indiana, at the behest and prompting of NAR [and the other Defendants] or each of them." *Id*., p. 10 (quoting Second Amended Complaint, ¶ 72).

9) In May of 2013, Defendant Vongphachanh and Ms. Moskerintz allegedly consulted with the NAR's general counsel "hop[ing] that he might identify some illegal practice by Plaintiff[,]" but a subsequent email sent to Vongphachanh by Moskerintz indicated that the NAR's counsel concluded that Data Research "'isn't doing anything legally wrong and there is not really any legal action for NAR to pursue.'" *Id*. (quoting Second Amended Complaint, ¶ 79).

10) "Upstate/Upstate MLS and NAR, in a calculated and collusive manner, . . . continued their campaign to damage the Plaintiff and to deny consumers access to their competing service." *Id*., p. 11 (quoting Second Amended Complaint, ¶ 80).

11) "As part of the plan or scheme to damage plaintiff, Ms. Moskerintz, as agent of NAR, on or before February 20, 2014, consulted with Sarah C. Young, another agent or employee of NAR,

regarding further additional [sic] investigation into the dealings of the Plaintiff. Ms. Moskerintz did this with full knowledge that NAR's counsel had previously informed her that Plaintiff 'isn't doing anything legally wrong.' In an email transmission to Ms. Young on same date, Moskerintz refers to Plaintiff representative Kim Henry as 'very deceptive and manipulative.'" *Id.* (quoting Second Amended Complaint, ¶ 83).

12) All of the Defendants, including the NAR, allegedly "again decided to arrange a meeting . . . to discuss how to approach HUD regarding the Plaintiff's activities, and on February 24, 2014, these Defendants did conduct a conference call with HUD, again trying to discredit Plaintiff, and to promote legal and enforcement action against Plaintiff." *Id.*, p. 11 (quoting Second Amended Complaint, ¶ 86).

13) "On March 4, 2014, and at the behest of Vongphachanh and Moskerintz, [another NAR employee] published an article to post on NAR's official website, discussing seller assisted down payments. . . . This article was written specifically for use to attack the Plaintiff, even though Plaintiff is not specifically identified in the article." *Id.* (quoting Second Amended Complaint, ¶ 88).

Data Research argues that these allegations and factual assertions (and more that are either irrelevant or conclusory, as the Court will discuss in a moment) are sufficient to meet its burden of establishing that the NAR has subjected itself to the jurisdiction of this Court as a result of its specific contacts with Indiana. Here's how Data Research summarizes its argument:

> These allegations go to the heart of the concerted effort by NAR and others to discredit and destroy Plaintiff's business. These acts directly affected an Indiana resident, and involved activities in Indiana. Although employees and agents of NAR may not have stepped foot in the state, their actions in coordinating with an Indiana co-defendant, and their forum-related activities directly harmed Plaintiff. .

13

. . Contrary to assertions by NAR that the alleged tortious conduct took place outside of Indiana, the direct communications with other Defendants, and the concerted effort to destroy the Plaintiff did take place in Indiana. There are sufficient contacts with the state, and sufficient malfeasance alleged to qualify and expose NAR to specific jurisdiction of the forum.

*Id.*, p. 12.

Data Research's argument is a house of cards, built on a wobbly foundation and held together by conclusions. Data Research makes a gallant effort to argue that the NAR's contacts with Indiana are sufficient to subject the Association to specific jurisdiction by presenting them in the context of the Plaintiff's collusion theory. Put another way, Data Research weaves the very few contacts the NAR had with Indiana into a much larger quilt, i.e., its theory that NAR was part of a larger conspiracy, to make them appear more significant. But when the Plaintiff's irrelevant assertions and conclusory allegations are removed from the equation, the actual "contacts" it alleges the NAR had in this state are exposed for what they are, which is minimal at most.

According to Data Research's own assertions and allegations in its Second Amended Complaint, as quoted above, the NAR's contacts with Indiana included the following: 1) a couple of "contacts" initiated by Moskerintz, over the course of five months, to inquire about Data Research's business model and "express[] its desire to work with Plaintiff on promoting plans like the Plaintiff's[]"; 2) the NAR's placement of "a link from its own website directly to Plaintiff's website[]"; and 3) the NAR's "invitation to Plaintiff's representative, Ms. Henry, to attend a[n] NAR seminar[.]" That is the sum and substance of the NAR's "contacts" with Indiana so far as the Plaintiff's claims are concerned, and it is not the stuff that specific jurisdiction is made of. Data Research presents no authority to support of its theory that a foreign corporation

that has only limited contacts with a forum state can nonetheless be subject to specific personal jurisdiction in that state based only on a plaintiff's conclusory allegation that those limited contacts were part of a broader scheme or plan designed to injure an Indiana-based plaintiff.

The vast majority of the factual assertions and legal allegations that Data Research presents in opposition to the NAR's motion to dismiss are either irrelevant or conclusory. One prime example is Data Research's statement that "Ms. Vongphachanh operates under the direction of the Defendants and each of them, including NAR, because she worked in conjunction and possible direction of NAR in efforts to harm the Plaintiff." But even Data Research admits that Ms. Vongphachanh "at all times relevant to the controversy, was and continues to be, an employee of Upstar and Upstar MLS." Second Amended Complaint, p. 2, ¶ 4. Still, Data Research makes the conclusory (and also rather vague) allegation that she was under the "possible direction of NAR," and that this constitutes some sort of nexus between the Association and this state. This is one example of how Data Research uses a legal conclusion (i.e., Vongphachanh was a de facto "agent" of NAR) as tape to hold its jurisdiction argument together. Another example is the Plaintiff's assertion that the NAR "used [its] contacts with [HUD] to provide HUD with false information" that in turn resulted in "an investigation of Plaintiff in Indiana, at the behest and prompting of NAR, [the other Defendants] or each of them." Even assuming the truth of these factual assertions, the only connection these alleged activities had to Indiana was that they concerned an Indiana company.

Data Research's Second Amended Complaint is 20 pages long and packed with factual detail and allegations. But the only facts and allegations that are important now are those that relate directly to the NAR and its contacts with Indiana, and they are not nearly sufficient to

subject the NAR to specific personal jurisdiction. While it is true that even limited contacts with a forum state may subject a defendant to specific personal jurisdiction, "the plaintiff must show that its claims against the defendant arise out of the defendant's *constitutionally sufficient contacts* with the state." *uBID, Inc. v. GoDaddy Group,* 623 F.3d at 425 (italics added). When a defendant's contacts with a forum state are few, they might still subject that defendant to specific jurisdiction if they are otherwise "constitutionally sufficient." That is, it is not just the quantity of contacts that matters, but the quality. In this case, the NAR's contacts with Indiana, according to Data Research's own allegations, lack *both* quantity and quality and therefore are not "constitutionally sufficient" to justify subjecting the Association to personal jurisdiction in Indiana.

Data Research cites just two cases in its brief to support its argument. The NAR points out, however, that those cases all pre-date *Goodyear*, *NExTT*, and *Daimler*, and "should be disregarded." Defendant's Memorandum, p. 7, n. 1; Defendant's Reply, p. 8. Data Research cites *Hispec Wheel & Tire, Inc. v. Tredit Tire & Wheel Co.*, 2005 WL 1983846 (N.D. Ind. Aug. 11, 2005) and *Heritage House Restaurants v. Continental Funding Group*, 906 F.2d 276 (7th Cir. 1990). Plaintiff's Response, pp. 7, 12. In *Hispec*, this Court (Judge Miller) found that a defendant who had never been in Indiana and did not own property in the state, but who contacted "persons in Indiana by telephone and e-mail . . . about twelve times per year[]" was subject to personal jurisdiction in this district. Judge Miller concluded that "[d]ozens of e-mails and telephone calls to persons in the state of Indiana constitute 'doing any business' in Indiana." *Hispec*, 2005 WL 1983846, at *3. In *Heritage House*, the Seventh Circuit held that "[t]he physical presence of a defendant in Illinois during the transaction is not necessary to obtain jurisdiction under the

long-arm statute. . . . Where a relationship is naturally based on telephone and mail contacts, these contacts can justify jurisdiction over a defendant." *Heritage House*, 906 F.2d at 281 (citations omitted). But, as the NAR points out, these cases lack precedential value because they applied a different (and looser) standard of review that has been replaced by the standard enunciated in *Goodyear*, *NExTT*, and *Daimler*. Accordingly, argues the NAR, they do not support the Plaintiff's argument.[3]

A finding of specific jurisdiction is not appropriate merely because a plaintiff's cause of action arose out of a general relationship between the parties. *RAR, Inc.*, 107 F.3d 1272, 1278 (7th Cir. 1997) (quoting *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995)). Rather, the action must directly arise out of the specific contacts between the defendant and the forum state. *Id.* "Therefore, in specific jurisdiction cases, a court must decide whether the defendant has 'purposefully established minimum contacts within the forum State' and consider whether, by

---

[3] The cases cited by Data Research wouldn't rescue the Plaintiff's argument anyway, even if they were good law, because they are inapposite. In *Hispec*, the subject defendant sent "[d]ozens of e-mails and telephone calls to persons in the state of Indiana[,]" which Judge Miller concluded was sufficient to warrant the imposition of personal jurisdiction over that defendant. More significantly, Judge Miller found that the defendant in *Hispec* was subject to personal jurisdiction in this district because he had submitted a sworn declaration in litigation that was ongoing in this Court. It was that act, much more than phone calls or emails, that convinced Judge Miller that the defendant had subjected himself to the jurisdiction of this Court. Judge Miller held that the defendant's "declaration is the type of 'single contact' that establishes a 'substantial connection' with Indiana, and his declaration is the entire basis for HiSpec's lone claim against him. . . . Traditional notions of fair play and substantial justice are not offended by [defendant] being haled into a court in Indiana to answer for signing an allegedly fraudulent declaration–a declaration whose intended and actual effect was the settling of a lawsuit with an Indiana corporation in a court sitting in Indiana." *Hispec*, 2005 WL 1983846, at *4. The *Heritage House* case also does not support the Plaintiff's argument: first, because it pre-dates *Goodyear* and *Daimler* by more than 30 years; and second, because it involved the application of an Illinois long-arm statute rather than the Indiana statute.

traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances." *U.S. Bank Nat. Ass'n v. Bank of Am., N.A.*, 2015 WL 5971126, at *8 (S.D. Ind. Oct. 14, 2015) (quoting *Burger King*, 471 U.S. at 475; *RAR, Inc.*, 107 F.3d at 1277). "Specific jurisdiction requires that the defendant purposefully availed itself of the privilege of conducting activities within the forum state so that the defendant reasonably anticipates being haled into court there." *Id.*

The NAR also points out that "'[f]or a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State. . . . The 'mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction.'" Defendant's Reply, p. 9 (quoting *Walden v. Fiore*, – U.S. – , 134 S.Ct. 1115, 1125 (2014)). A sister court explained it this way:

> For specific jurisdiction, due process requires that a non-resident entity have established contacts with the forum state by purposefully availing itself of the privilege of conducting business there. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987). To "purposefully avail" itself in a forum state, a non-resident entity's conduct and connection with the forum state should be such that it should reasonably anticipate being hauled into court in that state. *Burger King*, 471 U.S. at 474. When determining whether personal jurisdiction may be exercised, the Court engages in a three step analysis: (1) identify the contacts an entity has with the forum; (2) analyze whether these contacts meet constitutional minimums and whether jurisdiction on the basis of these minimum contacts sufficiently comports with fairness and justice; and (3) determine whether the sufficient minimum contacts, if any, arise out of or are related to the causes of action involved in the suit. *See GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009).

*Eli Lilly & Co. v. Arch Ins. Co.*, 2017 WL 2930571, at *3 (S.D. Ind. July 10, 2017). Furthermore, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the

basis for its jurisdiction over him." *Walden*, 134 S.Ct. at 1122-23 (citing *Burger King*, 471 U.S. at 478) ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot"); *Kulko v. Superior Court of Cal., City and County of San Francisco*, 436 U.S. 84, 93 (1978) (declining to "find personal jurisdiction in a State . . . merely because [the plaintiff] was residing there")). The Court elaborated in *Walden* as follows:

> To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. . . . Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the "random, fortuitous, or attenuated" contacts he makes by interacting with other persons affiliated with the State.

*Id.* (quoting *Burger King*, 471 U.S. at 475). "The plaintiff must still prove that the defendant had constitutionally sufficient contacts with the forum and that the defendant's contacts were temporally and substantively related to the lawsuit. Without that showing, the mere fact that the defendant allegedly caused harm by conducting business or advertising over the Internet is not adequate to establish jurisdiction in the plaintiff's chosen forum state." *uBID, Inc.*, 623 F.3d at 431 (citations omitted). "[A]n allegation of injury in the district, without more, will not support the exercise of personal jurisdiction or establish venue." *Sanderson v. Spectrum Labs, Inc.*, 227 F.Supp.2d 1001, 1007 (N.D.Ind. 2000) (citing *Sportmart, Inc. v. Frisch*, 537 F.Supp. 1254, 1259 (N.D.Ill. 1982)). In this case, the NAR's contacts with Indiana, both in terms of its general activities and its specific conduct as alleged by Data Research, are not "constitutionally

sufficient" to subject the Association to personal jurisdiction in this Court.[4]

## CONCLUSION

For the reasons discussed above, the motion to dismiss filed by Defendant National Association of Realtors (ECF 74) is GRANTED and the Plaintiff's claims against the NAR are dismissed. The Plaintiff's claims against the remaining Defendants are unaffected by this Order and remain pending.

Date: February 27, 2018.

/s/   William C. Lee
William C. Lee, Judge
U.S. District Court
Northern District of Indiana

---

[4] Data Research also contends that the NAR is subject to personal jurisdiction in this Court because Section 12 of the Clayton Act, 15 U.S.C. § 22, provides for nationwide service of process in Sherman Act claims such as the one alleged by Data Research. But as this Court previously held, "Section 12 . . . provides for nationwide service of process, but absent venue in the proper forum, the nationwide service provided for in § 12 is ineffective." *Sanderson v. Spectrum Labs, Inc.*, 227 F. Supp. 2d 1001, 1006 (N.D. Ind.), aff'd, 248 F.3d 1159 (7th Cir. 2000); *see also, KM Enterprises v. Global Traffic Technologies*, 725 F.3d 718, 730 (7th Cir. 2013) ("to avail oneself of the privilege of nationwide service of process, a plaintiff must satisfy the venue provisions of Section 12's first clause."). Given the Court's conclusion that the NAR's contacts with Indiana are insufficient to subject it to general personal jurisdiction in this district, i.e., that it is not "at home" in the state for due process purposes, the nationwide service provisions of Section 12 do not help Data Research meet its burden of establishing that the NAR should be subjected to personal jurisdiction in this state.